# EXHIBIT 1

Plaintiffs' First Amended Complaint &
Demand for Jury Trial

Electronically Filed
6/4/2018 3:27 PM
Steven D. Grierson
CLERK OF THE COURT

**ACOM**

| | |
|---|---|
| Mark P. Robinson, Jr. | Robert T. Eglet |
| California Bar No. 54426 | Nevada Bar No. 3402 |
| (*Nevada pro hac pending*) | Robert M. Adams |
| Daniel S. Robinson | Nevada Bar No. 6551 |
| California Bar No. 244245 | **EGLET PRINCE** |
| (*Nevada pro hac pending*) | 400 S. Seventh St., Suite 400 |
| **ROBINSON CALCAGNIE, INC.** | Las Vegas, NV 89101 |
| 19 Corporate Plaza Drive | (702) 450-5400; Fax: (702) 450-5451 |
| Newport Beach, CA 92660 | eservice@egletlaw.com |
| (949) 720-1288; Fax (949) 720-1292 | *Attorneys for Plaintiffs Jovanna and Frank* |
| mrobinson@robinsonfirm.com | *Calzadillas* |
| Richard K. Hy | |
| Nevada Bar No. 12406 | [Additional Counsel On Signature Page] |
| (*Nevada local counsel*) | |
| **EGLET PRINCE** | Kevin R. Boyle |
| 400 S. Seventh St., Suite 400 | (*Nevada pro hac pending*) |
| Las Vegas, NV 89101 | California Bar No. 192718 |
| (702) 450-5400; Fax: (702) 450-5451 | Rahul Ravipudi |
| *Attorneys for Plaintiffs Rachel Sheppard;* | Nevada Bar No. 14750 |
| *Stephanie Fraser; Lotus Herrera as* | Gregorio V. Silva |
| *Special Administrator of the Estate of* | Nevada Bar No. 13583 |
| *Brian Fraser; Stephanie Fraser, as the* | Ellin Mardirosian |
| *Guardian Ad Litem for Aubree Fraser and* | Nevada Bar No. 14399 |
| *Brayden Fraser* | **PANISH SHEA & BOYLE LLP** |
| | 8816 Spanish Ridge Avenue |
| [Additional Counsel On Signature Page] | Las Vegas, NV 89148 |
| | (702) 560-5520; Fax: (702) 975-2515 |
| | boyle@psblaw.com |
| | *Attorneys for Plaintiffs Nicholas and* |
| | *Anthony Robone* |

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| RACHEL SHEPPARD an Individual, LOTUS HERRERA an Individual and as Special Administrator of the Estate of BRIAN FRASER, decedent; STEPHANIE FRASER as the Guardian Ad Litem for AUBREE FRASER, a minor; STEPHANIE FRASER as the Guardian Ad Litem for BRAYDEN FRASER; JOVANNA CALZADILLAS an Individual, FRANCISCO CALZADILLAS an Individual; NICHOLAS ROBONE an Individual; ANTHONY ROBONE an Individual; | CASE NO.: A-18-769752-C DEPT. NO.: XXIV <br><br> **FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL** <br><br> Exemption from Arbitration Requested Wrongful Death |

- 1 -

**FIRST AMENDED COMPLAINT**

Plaintiffs,

vs.

MANDALAY BAY, LLC, f/k/a
MANDALAY CORP., a Nevada Domestic
Limited-Liability Company; MANDALAY
RESORT GROUP, a Nevada Corporation;
MGM RESORTS FESTIVAL GROUNDS,
LLC, a Nevada Domestic Limited-Liability
Company; MGM RESORTS VENUE
MANAGEMENT, LLC, a Nevada Domestic
Limited-Liability Company; MGM
RESORTS INTERNATIONAL, a Delaware
Corporation; DOES/ROES 1 through 100

Defendants.

## COMPLAINT

COME NOW Plaintiffs Rachel Sheppard, Stephanie Fraser, individually and as the Guardian Ad Litem for Aubree Fraser, a minor, and Brayden Fraser, a minor, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, deceased, by and through their attorneys, Mark P. Robinson, Jr., Esq., of the law firm ROBINSON CALCAGNIE, INC., and James Lee, Esq., of the LEE MURPHY LAW FIRM; Jovanna Calzadillas and Francisco Calzadillas by and through their attorneys, Robert T. Eglet, Esq. and Robert M. Adams, Esq., of the law firm EGLET PRINCE and Patrick McGroder III, of the law firm GALLAGHER & KENNEDY; and Plaintiffs Nicholas Robone and Anthony Robone, by and through their attorneys, Kevin R. Boyle, Esq., Rahul Ravipudi, Esq., Gregorio V. Silva, Esq. and Ellin Mardirosian, Esq., of the law firm PANISH SHEA & BOYLE LLP (collectively, "Plaintiffs") bring this action against Defendants Mandalay Bay, LLC f/k/a Mandalay Corp., Mandalay Resort Group, MGM Resorts Festival Grounds, LLC, MGM Resorts Venue Management, LLC, MGM Resorts International, and Does/Roes 1-100 (hereinafter collectively, "MGM"), with personal knowledge as to their own actions, and upon information and belief as to those of others, and respectfully allege the following:

## NATURE OF THE ACTION

1.      Columbine. Aurora. Sandy Hook. San Bernardino. Sutherland Springs. Pulse. Mass shootings are now a common occurrence in everyday life. They indiscriminately take place

- 2 -

**FIRST AMENDED COMPLAINT**

1   at schools, movie theaters, places of worship, work, nightclubs, and concerts.  It is not a matter of

2   "if," but rather "when" the next mass shooting takes place.

3       2.      This action seeks to redress MGM's inadequate, unreasonable, and egregiously

4   deficient security, which resulted in an MGM VIP Guest ("Shooter") orchestrating the deadliest

5   mass shooting in United States history, causing injuries to Plaintiffs attending an MGM promoted

6   event held on MGM premises ("Mass Shooting").

7       3.      Specifically, MGM's negligence caused:

8           a.   Rachel Sheppard to be shot three times by the Shooter—once in the upper

9                chest, once in the torso, and once in the abdomen—causing her to nearly bleed

10                to death and requiring four surgeries;

11           b.   Brian Fraser to be shot in the chest while trying to escape from the Shooter,

12                ultimately causing his death.  Brian Fraser is survived by his two children,

13                Aubree and Brayden Fraser, and his wife, Stephanie Fraser, who was next to

14                her husband, Brian Fraser, during the shooting, causing her to suffer severe

                emotional distress, among other injuries;

15           c.   Jovanna Calzadillas to be shot in the head—as her husband, Francisco

16                Calzadillas, shielded her from the gunfire—causing paralysis and permanent

17                brain damage; and

18           d.   Nicholas Robone to be shot in the upper chest causing him to cough blood—

19                which his brother Anthony Robone witnessed—requiring surgery and weeks

20                of physical therapy.

21       4.      For three to six days prior to the Mass Shooting, MGM conveyed certain privileges

22   to the Shooter, including use of a service elevator not intended to be accessible to guests or the

23   public, which the Shooter used, with the assistance of MGM employees, to carry approximately

24   24 suitcases and/or bags and a large white container carrying at least 23 guns, including 22 assault

25   rifles, to two adjacent suites on the 32nd floor of the Mandalay Bay Resort and Casino Las Vegas

26   located at 3950 South Las Vegas Boulevard, Las Vegas, NV 89119 ("Mandalay Bay").

27

28

- 3 -

**FIRST AMENDED COMPLAINT**

5.      Despite having repeated interactions with the Shooter, not a single MGM staff member, manager, or security team member inquired with the Shooter about the nearly 25 bags and containers he brought with him, even though he apparently remained alone his entire stay.

6.      During those three to six days, while the Shooter prepared for the Mass Shooting, MGM failed to exercise due care for the safety of its guests, deliberately ignoring countless signs of suspicion that, if noticed, would have prevented, or significantly thwarted, the Shooter's efforts.

7.      In addition to the suspiciously large number of bags the Shooter had, he carried his guns through hotel passages openly available to Mandalay Bay patrons, and he specifically requested two rooms overlooking the Route 91 Harvest Festival ("Route 91 Festival"). The Shooter procured a second room, using his girlfriend's name, despite being alone his entire stay. He also installed an elaborate surveillance system in the hotel, installing two cameras in the hallway outside of his suites and one in the peep hole on his door.

8.      The Shooter also used power tools to barricade an entrance in the hallway, and he refused to allow anyone to service his room without his supervision. He also left a "Do Not Disturb" sign on his room for more than 36 hours without investigation by any MGM personnel.

9.      For up to twenty minutes, the Shooter broke out the windows in his rooms and used an arsenal of weapons to reign gun fire on persons in attendance of the Route 91 Festival, a three-day country music festival promoted by and held on MGM premises, which Plaintiffs attended.

10.     During the Mass Shooting, MGM gave no assistance, direction, or information to Plaintiffs, or any of the other 20,000 (approximately) festival goers, about the existence or the location of the Shooter, and how to escape to safety.

11.     Instead, the Route 91 Festival attendees were trapped inside the festival venue, preventing Plaintiffs and thousands of others from escaping the gun fire. For instance, many of the festival's exits were either closed, blocked off, or completely barricaded by MGM, and the few available exits were not well marked or lit.

12.     Even worse, MGM had immediate, actual knowledge of the location of the Shooter and that hundreds of rounds were being fired from his suite to the Route 91 Festival. Still, MGM failed to take any action to stop or deter the Shooter, and failed to accurately provide law enforcement with the Shooter's location.

- 4 -

**FIRST AMENDED COMPLAINT**

13.     As a result of MGM wrongful conduct, acts, and omissions, 58 people in attendance perished, including Brian Fraser, and thousands more were injured, including Rachel Sheppard, Stephanie Fraser, Jovanna Calzadillas, Francisco Calzadillas, Nicholas Robone and Anthony Robone.

## PARTIES

**Plaintiff Rachel Sheppard**

14.     Plaintiff Rachel Sheppard is and at all times relevant hereto was a resident of the State of California.

15.     Rachel Sheppard purchased a ticket to the Route 91 Festival, and at all relevant times was a paying customer of MGM.

16.     During her stay in Las Vegas for the Route 91 Festival, Rachel Sheppard was a paying customer of Excalibur Hotel and Casino ("Excalibur"), a hotel owned and operated by MGM.

17.     As a result of MGM's wrongful conduct, acts, and omissions, Rachel Sheppard was shot three times by the Shooter—once in the upper chest, once in the torso, and once in the abdomen—blasting her to the ground, injuring her back, and severing her aorta.  She nearly bled to death three times, requiring 40 units of blood, coded twice, and to date has undergone four surgeries, including one where she was opened from her pubic bone to her throat in order for her chest to be sawed open so that her aorta could be repaired.

**Plaintiffs Stephanie Fraser, Brian Fraser, Aubree Fraser, and Brayden Fraser**

18.     Plaintiff Stephanie Fraser brings this case on behalf of her family and individually. Lotus Herrera as Special Administrator of the Estate of Brian Fraser, deceased; Stephanie Fraser, as the Guardian Ad Litem for Aubree Fraser, a minor; and Stephanie Fraser, as the Guardian Ad Litem for Brayden Fraser, a minor, is and at all times relevant hereto was a resident of the State of California.

19.     Brian Fraser, decedent, was at all times hereto a resident of the State of California. Stephanie Fraser, surviving spouse; Aubree Fraser, child; and Brayden Fraser, child, of Brian Fraser are the only heirs to Brian Fraser as defined in N.R.S. 41.085.

- 5 -

**FIRST AMENDED COMPLAINT**

20.     Brian and Stephanie Fraser ("Frasers") purchased tickets to the Route 91 Festival, and at all relevant times were paying customers of MGM.



21.     During their stay in Las Vegas for the Route 91 Festival, the Frasers were paying customers of Mandalay Bay.  The Frasers went to Las Vegas with a large group of family and friends who spent time together at the Mandalay Bay swimming pool and at the casino floor where they discussed the Route 91 Festival with MGM's employees.  During Brian Fraser's stay, MGM provided him with an M-Life players card.



22.     As a result of MGM's wrongful conduct, acts, and omissions, Brian Fraser was shot in the chest by the Shooter, injuries from which he suffered for an appreciable amount of time but which ultimately caused his death.

23.     As a result of MGM's wrongful conduct, acts, and omissions, Stephanie Fraser witnessed her husband, Brian Fraser, be shot, fall to the ground, and be given CPR, causing her severe emotional distress, among other injuries.

**FIRST AMENDED COMPLAINT**

**Plaintiff Jovanna Calzadillas, and Francisco Calzadillas**

24. Plaintiff Jovanna Calzadillas is and at all relevant times hereto was a resident of the State of Arizona.

25. Plaintiff Francisco Calzadillas is and at all relevant times hereto was a resident of the State of Arizona.

26. Jovanna and Francisco Calzadillas ("Calzadillas") purchased tickets to the Route 91 Festival, and at all relevant times were paying customers of Defendants.

27. During their stay in Las Vegas for the Route 91 Festival, the Calzadillas were paying customers of the Luxor Hotel and Casino, an MGM property, and were members of MGM's M-Life rewards program. Francisco Calzadillas recently returned from military deployment and he was vacationing with his wife in Las Vegas.

28. As a result of Defendants' wrongful conduct, acts, and omissions, Jovanna Calzadillas was shot in the head by the Shooter, causing paralysis and permanent disability. As a result of Defendants' wrongful conduct, acts, and omissions, Francisco Calzadillas witnessed his wife, Jovanna Calzadillas, be shot, and he carried her lifeless body out of the concert venue causing him severe emotional distress.

**Plaintiff Nicholas Robone and Anthony Robone**

29. Plaintiff Nicholas Robone is and at all relevant times hereto was a resident of Clark County, Nevada.

30. Plaintiff Anthony Robone is and at all relevant times hereto was a resident of Clark County, Nevada.

31. Nicholas Robone and his brother Anthony Robone purchased or received as gifts tickets to the Route 91 Festival, and at all relevant times were paying customers of MGM.

32. As a result of Defendants' wrongful conduct, acts, and omissions, Nicholas Robone suffered a gunshot wound to his upper chest, the bullet just missing his heart, but bruising his lungs, requiring weeks of physical therapy and medical treatment.

33. As a result of Defendants' wrongful conduct, acts, and omissions, Anthony Robone witnessed his brother, Nicholas Robone, be shot, and Anthony Robone carried his brother's

**FIRST AMENDED COMPLAINT**

1  bleeding body out of the concert venue causing him severe emotional distress, among other

2  injuries.

3  **Defendant Mandalay Bay, LLC f/k/a Mandalay Corp.**

4  34.    At all relevant times, Defendant Mandalay Bay, LLC f/k/a Mandalay Corp. was a

5  Nevada Domestic Limited-Liability Company duly licensed and incorporated under the laws of

6  Nevada, with its principal place of business in Clark County, Nevada, and, as a subsidiary of

7  Defendant MGM Resorts International, is believed to be the owner, operator, lessor, and/or

8  manager of Mandalay Bay.  Mandalay Bay, LLC had its own VIP section inside the Las Vegas

9  Village.

**Defendant Mandalay Resort Group**

10  35.    At all relevant times, Defendant Mandalay Resort Group was a Nevada Domestic

11  Corporation duly licensed and incorporated under the laws of Nevada, with its principal place of

12  business in Clark County, Nevada, and is the managing member of Mandalay Bay, LLC, and, as

13  a subsidiary of Defendant MGM Resorts International, is believed to be the owner, operator,

14  lessor, and/or manager of Mandalay Bay.   In addition, Mandalay Resort Group owns and/or

15  operates multiple hotels under its umbrella including, but not limited to:

16          a.  Victoria Partners, dba Monte Carlo Resort and Casino ("Monte Carlo");

17          b.  Circus Circus Casinos, Inc., dba Circus Circus Hotel and Casino Las Vegas

18              ("Circus Circus");

19          c.  Ramparts, Inc., dba Luxor Hotel and Casino ("Luxor");

20          d.  New Castle Corp., dba Excalibur Hotel and Casino ("Excalibur"); and

21          e.  Mandalay Bay LLC dba Mandalay Bay Resort and Casino and the Delano f/k/a

22              THEHotel ("Mandalay Bay").

23  **Defendant MGM Resorts Festival Grounds, LLC**

24  36.    At all relevant times, Defendant MGM Resorts Festival Grounds, LLC, was a

25  domestic limited-liability company duly licensed and incorporated under the laws of Nevada, with

26  its principal place of business in Clark County, Nevada, and is believed to be the owner and/or

27  operator of the Las Vegas Village, the concert venue where the Route 91 Festival occurred in

28  September and October 2017.

- 8 -

**FIRST AMENDED COMPLAINT**

1
2
3

**Defendant MGM Resorts Venue Management, LLC**

4       37.    At all relevant times, Defendant MGM Resorts Venue Management, LLC was a

5   domestic limited-liability company duly licensed and incorporated under the laws of Nevada, and

6   believed to be the concert and/or event promoter of the Route 91 Festival in September and October

7   2017.

8       **Defendant MGM Resorts International**

9       38.    At all relevant times, Defendant MGM Resorts International was a corporation duly

10  licensed and incorporated under the laws of Delaware, with its principle place of business in Clark

11  County, Nevada, and is the parent company and alter-ego of Defendant Mandalay Bay, LLC f/k/a

12  Mandalay Corp., Defendant Mandalay Resort Group, and Defendant MGM Resorts Festival

13  Grounds, LLC, Defendant MGM Resorts Venue Management, LLC, and is believed to be the

14  owner, co-owner, operator, lessor, lessee and/or manager of Excalibur and Mandalay Bay, as well

15  as Las Vegas Village, an open-air concert and event venue adjacent to the Mandalay Bay consisting

16  of 15 acres of seating area with a capacity of 40,000 guests located at 3901 South Las Vegas

17  Boulevard, Las Vegas, NV 89119 ("Las Vegas Village").  MGM Resorts International had its own

18  VIP section inside the Las Vegas Village.  MGM Resorts International is also believed to be the

19  permit holder for the Route 91 Festival, and responsible for the security at the Mandalay Bay and

20  Las Vegas Village.

21      **Unknown Defendants**

22      39.    The true names and/or capacities, whether individual, corporate, partnership,

23  associate or otherwise, of the Defendants herein designated as Does and/or Roes are unknown to

24  Plaintiffs at this time who, therefore, sues said Defendants by fictitious names.  Plaintiffs allege

25  that each named Defendant herein designated as Does and/or Roes is negligently, willfully,

26  contractually, or otherwise legally responsible for the events and happenings herein referred to and

27  proximately caused damages to Plaintiffs as herein alleged.  Plaintiffs will seek leave of Court to

28  amend this Complaint to insert the true names and capacities of such Defendants when they have

been ascertained and will further seek leave to join said Defendants in these proceedings.

- 9 -

**FIRST AMENDED COMPLAINT**

40.     Plaintiffs are informed and believe and thereon alleges that at all times mentioned herein, Does and/or Roes were agents, servants, employees, partners, distributors or joint venturers of each other and that in doing the acts herein alleged, were acting within the course and scope of said agency, employment, partnership, or joint venture. Each and every Defendant aforesaid was acting as a principal and was negligent or grossly negligent in the selection, hiring and training of each and every other Defendant or ratified the conduct of every other Defendant as an agent, servant, employee or joint venture.

41.     Plaintiffs are informed and believe and thereon allege that Defendants Mandalay Bay, LLC f/k/a Mandalay Corp.; Mandalay Resort Group; MGM Resorts Festival Grounds, LLC; MGM Resorts Venue Management, LLC; MGM Resorts International; and Does/Roes currently unknown to Plaintiffs at this time participated in a joint venture when it organized, held, marketed, secured and/or otherwise hosted the Route 91 Festival. Defendants, as co-venturers to this business enterprise, relied on each other's unique skill and expertise in order to share in the profits from the Route 91 Festival. What neither could accomplish on its own, the Defendants could accomplish together as part of the joint venture.

## JURISDICTION AND VENUE

42.     Exercise of the jurisdiction by this Court over each and every Defendant in this action is appropriate because each and every Defendant has done, and continues to do, business in the State of Nevada, and committed a tort in the State of Nevada.

43.     Exercise of the jurisdiction by this Court is further appropriate where all incidents described herein occurred in Clark County, Nevada.

## GENERAL ALLEGATIONS

### A. MGM Failed to Exercise Due Care

44.     Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein. Based on information and belief, Plaintiffs assert the additional allegations below.

45.     The Shooter was a VIP guest of Mandalay Bay, and his room charges were compensated by the hotel. The Shooter was permitted to specifically select his room—choosing

- 10 -

**FIRST AMENDED COMPLAINT**

rooms with a vantage point from which to carry out the Mass Shooting—and to make changes to the layout of the rooms to assist with his plan.

46.     Because of his VIP status, MGM gave the Shooter extra leeway and privileges, and either relaxed or failed to enforce the inadequate security policies and procedures that it has in place for the safety of its guests.

47.     On Monday, September 25, 2017, six days before the October 1, 2017 Mass Shooting, the Shooter checked into corner suite 32-135 on the 32nd Floor of the Mandalay Bay, a suite specifically selected by the Shooter with a view overlooking the Route 91 Festival.

48.     On September 29, 2017, the Shooter, despite apparently being alone his entire stay, used his girlfriend's name to check into suite 32-134, which connected with room 32-135 via a door in between.  Both rooms had a scheduled check-out date of October 2, 2017.



49.     MGM, including the Mandalay Bay premises, has a "strict no weapons" policy.  In so doing, MGM voluntarily assumed, and continues to assume, a duty to protect its patrons by prohibiting firearms on its premises, recognizing such prohibition as being necessary for their safety. However, MGM failed to enforce this policy against the Shooter, which resulted in the Plaintiffs' damages.

50.     After checking in, MGM's employees allowed the Shooter to use a service elevator to transport numerous bags, which contained an arsenal of weapons, explosive material, and ammunition, to his room.  It is against MGM's policy, which is designed for the safety of its guests, to allow non-employees to use the service elevators or bring firearms onto hotel premises.

- 11 -

**FIRST AMENDED COMPLAINT**

51.     Specifically, based on Event # 171001-3519 LVMPD Force Investigation Team Report ("Report"), subsequent reports, and upon information and belief, not only was MGM negligent in prohibiting firearms, ammunition, and explosives to accumulate in rooms 32-135 and 32-134, but MGM's employees escorted, delivered, carried and/or helped the Shooter carry the prohibited and dangerous items to the rooms:

a.  On September 25, 2017, at approximately 4:56 pm, the Shooter had valet at Mandalay Bay unload his vehicle and then went to the front desk with approximately **five suitcase bags**.  A Mandalay Bay bellman met the Shooter who requested to use the service elevators, not the guest elevators, and escorted him to room 32-135.  The Shooter rolled one bag and the bellman used a luggage cart to carry approximately four bags with firearms, assault weapons, ammunition, tripods, explosive material, and other prohibited items:



b.  On September 26, 2017, at approximately 10:52 pm, the Shooter again valeted his vehicle at Mandalay Bay and this time had approximately **seven additional suitcase bags** removed from his vehicle and had six placed on a luggage cart and rolled one himself.  Again, the Mandalay Bay bellman took the seven bags and the Shooter through the service elevator instead of the guest elevators to room 32-135:

- 12 -

**FIRST AMENDED COMPLAINT**

1
2
3
4
5
6
7
8
9



10       c.   On September 28, 2017, at approximately 9:46 pm, the Shooter valeted his

11            vehicle and removed approximately **one white container, two rolling**

12            **suitcases** and **a laptop bag**, taking the service elevator to his room:

13
14
15
16
17
18
19
20

21       d.   On September 30, 2017, at approximately 5:56 am, the Shooter returned to

22            Mandalay Bay and removed approximately **four suitcase bags** from his

23            vehicle and moved them to his room:

24
25
26
27
28

- 13 -

**FIRST AMENDED COMPLAINT**



e. Also on September 30, 2017, at approximately 2:52 pm, valet retrieved the Shooter's vehicle, which the Shooter immediately moved to the self-parking garage. At approximately 3:12 pm, the Shooter retrieved approximately **two more bags** from his vehicle in self-parking and utilized the guest elevator to take the additional two bags to his room:



f. On October 1, 2017, at approximately 12:29 pm, the Shooter transported approximately **two additional rolling suitcases and another bag** hanging from one of the rolling suitcases and utilized the guest elevators to take the bags and rolling suitcases carrying prohibited items to his rooms:

- 14 -

**FIRST AMENDED COMPLAINT**



52.    MGM's employees also went into the Shooter's rooms multiple times to perform cleaning, housekeeping, and food service delivery or retrieval, where Plaintiffs believe employees either witnessed his cache of weapons, explosive materials, power tools, hammers, tripods, ammunition, and homemade gas masks, and failed to report their observations to law enforcement; or failed to recognize his cache of weapons, explosive materials, power tools, hammers, tripods, ammunition, homemade gas masks, and therefore negligently and carelessly did not report their observations to law enforcement.

53.    If the latter, MGM's employees still went into the Shooter's room and saw a single individual with more than 20 bags of luggage in his rooms, who refused to allow anyone in his rooms without his supervision, which should have triggered action on their part and on the part of any reasonable hotel employee/agent.

54.    Based on the above-mentioned Reports, and upon information and belief, MGM's employees negligently and carelessly failed to discover and/or notify law enforcement of the Shooter's wrongful, dangerous, suspicious, and potentially harmful conduct on at least the following dates and times:

      a.  On September 27, 2017, sometime after 4:00 pm, when delivering two entrees to the Shooter in room 32-135;

      b.  On September 27, 2017, at approximately 4:32 pm, when cleaning room 32-135 with the Shooter remaining in the room;

- 15 -

**FIRST AMENDED COMPLAINT**

c.  On September 29, 2017, at approximately 2:00 pm, when cleaning room 32-135 with the Shooter remaining in the room and instructing the staff not to vacuum the floor;

d.  On September 29, 2017, at approximately 11:00 pm, when delivering food to room 32-134 for the Shooter;

e.  On September 30, 2017, around noon, when servicing the mini bar in room 32-134;

f.  On September 30, 2017, shortly after noon, the Shooter placed a "Do Not Disturb" sign on the doors to rooms 32-135 and 32-134, and declined any further cleaning service; and

g.  On October 1, 2017, at approximately 1:37 pm, when delivering another meal to room 32-134, trusted hotel staff employees accessed the room and were in contact with the Shooter, the room, the luggage, the prohibited firearms, ammunition or other prohibited items, including approximately 21 assault rifles, one long rifle, one handgun, 5,000 rounds of ammunition, explosive materials, power tools, hammers, tripods, and **at least 20 bags** which carried the prohibited items, including approximately 16 bags which were previously transported and delivered by MGM's employees.

55.     Sometime between September 28, 2017 and October 1, 2017, the Shooter used power tools to bolt the stairwell door closed, which, remarkably, MGM either ignored given the Shooter's VIP status, or it went undetected until immediately prior to the Mass Shooting because of Mandalay Bay's inadequate security. And, on October 1, 2017, between 2:23 pm and 7:40 pm, the doors of rooms 32-134 and 32-135 were manipulated multiple times, which MGM detected, but ignored. For example, the doors were opened, closed, and the dead bolt locks were engaged and disengaged several times, without any investigation by MGM.

56.     During this period, the Shooter used power tools to install one camera in the peephole of his suite and at least two more cameras in the hallway, with one of the cameras on a Mandalay Bay food service cart left by the Shooter in the hallway outside his room. The Shooter

- 16 -

**FIRST AMENDED COMPLAINT**

used these video cameras to keep a lookout into on the hallway, and to attempt to thwart security

and/or law enforcement:



57.    Inexplicably, MGM either intentionally ignored this surveillance system entirely

given the Shooter's VIP status, or it went completely undetected until after the Mass Shooting had

ended because of Mandalay Bay's inadequate security.



58.    Given the totality of the circumstances, MGM was either on notice that guests on

its premises could be harmed by the Shooter, or, at a minimum, failed to enforce its "strict no

weapons" policy and failed to exercise due care for the safety of its patrons or other persons on its

premises that would have prevented the Mass Shooting from occurring.

**B. MGM's Negligence During the Mass Shooting**

59.    Leading up to the Route 91 Festival event, MGM actively promoted the event,

including comping its patrons with free tickets to the festival and having its employees, including

dealers at Mandalay Bay, promote the event to the hotel's patrons.

- 17 -

**FIRST AMENDED COMPLAINT**

60. On the Route 91 Festival website, Mandalay Bay and MGM's other hotels—with the majority of properties belonging to Mandalay Resort Group—were promoters of the event, offering exclusive hotel offers to those in attendance:

 

61. MGM also used social media to promote the Route 91 Festival, including the twitter accounts of both MGM Resorts International and Mandalay Bay:



- 18 -

**FIRST AMENDED COMPLAINT**

62.     On October 1, 2017, Plaintiffs entered the Route 91 Festival, which took place at the Las Vegas Village, a recreational facility owned by MGM that is adjacent to and used or maintained in connection with MGM's Mandalay Bay, Excalibur, Delano, Luxor, and other MGM hotels. As they entered the Las Vegas Village the Plaintiffs' person and possessions were searched for weapons.

63.     At approximately 8:40 p.m., a HotSOS alarm (triggered when a guest's room door is left ajar for a predetermined amount of time) was generated from room 32-129. MGM has a policy to investigate such alarms in order to ensure the safety of its guests and its guests' belongings. MGM deliberately waited until 9:11 p.m., over 30 minutes after the alarm was generated, to assign Mandalay Bay's security guard Jesus Campos to investigate room 32-129. Remarkably, Mr. Campos waited until approximately 9:47 p.m., more than one hour after the HotSOS alarm was first generated, to investigate room 32-129.

64.     Plaintiffs are informed and believe and herein allege that this inexcusable delay was due to a lack of security staffing, and MGM's inadequate security policy and procedures, which forced Mr. Campos, the only security guard responsible for the 100-wing section of the Mandalay Bay at the time, to investigate four other HotSOS alarms first.

65.     While on route to room 32-129 through the 100-wing stairwell, Mr. Campos noticed the stairwell entrance to the 32nd floor had been barricaded, preventing his access to the 32nd Floor. At approximately 10:00 p.m., after walking up to the 33rd floor and using a guest elevator to get to the 32nd Floor, Mr. Campos confirmed room 32-129 was secure. He then checked the entrance to the 100-wing stairwell and discovered an "L" bracket screwed into the door and frame, preventing it from being opened. Inexplicably, Mr. Campos reported this finding to the Maintenance Department instead of MGM Security.

66.     Due to MGM's lack of staffing and inadequate security policies and procedures, Mr. Campos failed to immediately check the HotSOS alarm for room 32-129, which would have resulted in Mr. Campos investigating the 100-wing stairwell entrance much sooner.

67.     At approximately 10:00 p.m., during the performance of Jason Aldean, the Shooter broke out two windows in his Mandalay Bay Hotel rooms, and began firing gunshots at the Route 91 Festival on the adjacent MGM owned property. Shortly after the shooting began, Mr. Campos

- 19 -

**FIRST AMENDED COMPLAINT**

walked down the 100-wing hallway when the Shooter fired shots at Mr. Campos, striking him in the left calf with a bullet fragment. Despite Mr. Campos telling his dispatcher that shots had been fired from room 32-135, MGM failed to immediately and correctly report this information to law enforcement, leading to a delayed and imprecise response by law enforcement, causing and contributing to the injuries and damages suffered by Plaintiffs.

68.     At approximately 10:10 p.m., hotel engineer, Stephen Schuck, arrived on the 32nd floor to investigate the "L" bracket blocking the stairwell entrance. While on route, Mr. Shuck reported to Mandalay Bay personnel that someone was shooting a rifle in the 100-wing hallway on the 32nd floor. Still, MGM failed to immediately and correctly report this information to law enforcement, leading to a delayed and imprecise response by law enforcement, causing and contributing to the injuries and damages suffered by Plaintiffs.

69.     For up to 20 minutes, the Shooter used an arsenal of weapons firing hundreds of rounds at the Route 91 Festival without interruption, killing 58 guests, including Brian Fraser, and injuring hundreds of others, including Stephanie Fraser, Rachel Sheppard, Jovanna and Francisco Calzadillas, Nicholas Robone, and Anthony Robone. Despite having direct knowledge of the exact location of the Shooter, at no point did MGM take any action to stop, deter, minimize the harm caused by the Shooter, or otherwise intervene.

70.     Despite the fact that Mr. Campos and Mr. Schuck both reported that shots were coming from room 32-135 and the 100-wing hallway of the 32nd floor, MGM failed to properly relay the Shooter's exact location to law enforcement or immediately send its own security to stop the Shooter. The Report indicates law enforcement had "conflicting information on the exact location of the Shooter(s) whether it was on the 31st, 32nd, or 33rd floors." Further when strike teams arrived, each group was "given information the Shooter was possibly on the 29th or 31st floor and taken there by elevator." Additional wrong information resulted in law enforcement being sent to the Foundation Room on the top floor of the Mandalay Bay. These failures caused by MGM allowed the Shooter to continue the Mass Shooting uninterrupted, causing and contributing to Plaintiffs' injuries.

71.     During Jason Aldean's performance, Rachel Sheppard was shot three times—once in the upper chest, once in the torso, and once in the abdomen. The shots threw her to the ground,

- 20 -

**FIRST AMENDED COMPLAINT**

where she injured her back and laid down screaming and jolting in pain. One bullet was removed in surgery during her initial hospitalization. Another bullet was removed during an additional surgery in December 2017. Rachel continues to have one bullet and numerous fragments in her body.

72.     During the ensuing chaos, a Good Samaritan picked Rachel up and carried her to the medical tent where she waited approximately 45 minutes for medical assistance. This Good Samaritan eventually forced himself into an ambulance and held Rachel Sheppard in the ambulance applying compresses to her bullet wounds. But for the heroic efforts of the Good Samaritan, Rachel Sheppard would probably have died at the scene like so many others. Rachel will be impacted and impaired for life as a result of the damages incurred.

73.     Similarly, the Frasers were in attendance of the Route 91 Festival with a large group of family and friends watching Jason Aldean's performance. During the performance, they heard what sounded like packaged firecrackers go off. Although, at first, they did not believe the sounds were gun shots, upon hearing the noise again, their friend forced them to the ground to protect them.

74.     While on the ground, Stephanie Fraser witnessed Brian Fraser crouch down to the ground and contort into a ball behind her. After the gun shots stopped, Stephanie Fraser began to stand up, and saw her husband and others fall to the ground when a second round of gunshots started.

75.     One of the Frasers' friends confirmed Brian Fraser had been shot, and he moved Brian and Stephanie Fraser to the VIP section bleachers, where two other people attempted to give Brian Fraser CPR while Stephanie Fraser watched. Stephanie Fraser continued to watch her husband receive CPR until Good Samaritans placed Brian Fraser into a wheelbarrow and they were forced to leave the premises. As a result of the chaos surrounding the shooting and the lack of clearly defined exits, Stephanie Fraser became separated from her husband, and learned hours later that he did not survive.

76.     Likewise, during Jason Aldean's performance, the Calzadillas were near the stage watching the final performance of the night. They were vacationing in Las Vegas after Francisco Calzadilla just returned home from deployment in the Middle East.

- 21 -

**FIRST AMENDED COMPLAINT**

77.     As the bullets began showering them from above, Jovanna Calzadillas was quickly shot in the head.  Jovanna Calzadillas, with her palms on the pavement, laid unresponsive as her husband tried to shield her from the gunfire.

78.     In the wake of the shooting, Francisco Calzadillas carried his wife's lifeless body out of the concert venue, found a police officer in his vehicle and together drove to a local medical facility.  Upon her arrival, Jovanna Calzadillas was evaluated in the trauma bay where significant brain matter was seen throughout the occipital aspect of her head.

79.     As a result of her injuries, Jovanna Calzadillas underwent a cranioplasty and tracheostomy, and she was eventually placed on a feeding tube.  While Jovanna Calzadillas laid paralyzed and permanently disabled in the hospital, doctors informed Francisco Calzadillas that his wife would not survive, and they recommend that she be taken off life support.

80.     Furthermore, Nicholas Robone and his brother Anthony Robone attended the Route 91 Festival in celebration of Nicholas Robone's birthday.   While watching Jason Aldean's performance together with several friends, Anthony Robone heard what he believed sounded like fireworks.  A short period later, Nicholas Robone had been shot in the upper chest and began spitting up blood, which his brother witnessed.  Anthony Robone then carried his brother away from the gunfire to safety and loaded him into an ambulance, which drove Nicholas Robone to the hospital while Anthony Robone stayed for approximately one hour to assist other victims.

81.     MGM failed to keep the Las Vegas Village venue reasonably safe, which also caused and contributed to Plaintiffs and other festival attendees' injuries.  For instance, the festival lacked a sufficient number of available exits for rapid disbursement of a crowd, as MGM had closed, blocked off, locked or completely barricaded many exits.  Likewise, the few exits that were available were not sufficiently marked with signs and/or were not well lit.

82.     Indeed, Plaintiffs believe that many of the venue exits for the venue were sealed to reduce MGM's security costs, and to prevent people from entering the festival without paying, thereby maximizing MGM's profits.  Rather than employing additional security personnel to watch and maintain the additional emergency exits, Plaintiffs believe MGM cut staffing costs by sealing those exits.

**FIRST AMENDED COMPLAINT**

1

**C.  MGM's Inadequate Security Policies and Procedures**

2       83.     While the Mass Shooting itself lasted less than twenty minutes, it should not, could

3  not, and would not have occurred but for the ongoing negligent acts and omissions of MGM.

4       84.     MGM employed, and continues to employ, inadequate security policies,

5  procedures, and safeguards to detect improper and/or prohibited items and conduct, such as those

6  used, and actions taken, by the Shooter.

7       85.     MGM holds itself out as the leading hospitality and entertainment company in the

8  world. While its current portfolio stands at 27 properties, MGM views and promotes itself as "one

9  united entertainment and hospitality company."

10       86.     MGM Resorts International grew its collection of properties, including some of its

11  signature brands, in part by way of various mergers and acquisitions. Of consequence to the

    allegations made herein, MGM Resorts International announced in June 2004 that it entered into a

12  definitive merger agreement with Mandalay Resort Group where the former would acquire the

13  latter for an estimated $7.9 billion. As part of the acquisition, MGM Resorts International obtained

14  Mandalay Resort Groups' portfolio of properties, including without limitation Mandalay Bay.

15       87.     MGM Resorts International sought, and continues to seek, to maximize its revenues

16  in order to drive profit growth.

17       88.     Upon information and belief, MGM Resorts International achieves this by

18  consolidating certain operations upon the completion of each merger and/or acquisition in order to

19  eliminate redundancies and reduce its operating costs.  By way of example, MGM uses a single

20  rewards program for its guests known as "M Life" for all its hotels. Additionally, prospective

21  employees of MGM are required to apply online at a single online portal containing available job

22  postings for all properties.

23       89.     Upon further information and belief, and at all times relevant herein, Mandalay

24  Bay's security operations were also consolidated with MGM Resorts International in order to

25  eliminate redundancies and reduce operating costs. Additionally, it is further believed that

26  Mandalay Bay then adopted the security policies, procedures and/or protocols of MGM Resorts

27  International, which are implemented and/or enforced across MGM's collection of properties.  It

28

**FIRST AMENDED COMPLAINT**

is also believed that Mandalay Bay and MGM's other hotels use a common security management and record keeping system.

90.     The majority of MGM's security is deliberately geared towards surveilling, monitoring, and/or observing gaming related activities to guard against theft.  This includes, without limitation, access to the casino cage; the use of multiple security personnel when transporting markers, chips, or case; and employing thousands of cameras to surveil table games to prevent internal and external theft.

91.     These security policies, procedures, and safeguards are intended to maximize MGM's profits, rather than ensure patrons' safety, by identifying instances of theft, recovering any lost monies stolen from the casino, identifying those individuals engaging in such conduct, and preventing such individuals from returning onto the property in the future.

92.     MGM's additional security resources are focused on accommodation over security, where security personnel perform tasks unrelated to security such as carrying luggage, opening doors, and otherwise providing exceptional customer service.  This, again, is intended to maximize MGM's profits, rather than take reasonable security measures for its patrons' safety.

93.     Plaintiffs are informed and believe and herein allege that MGM's security resources are not dedicated to proactively detecting suspicious activity, firearms, and other prohibited weapons of that nature that could harms its guests, despite MGM's express prohibition of such items.  Indeed, MGM deliberately allows its VIP guests, such as the Shooter, to breach its security policies and procedures in order to retain its VIP guests' business.

94.     In addition, MGM has not updated its security policies, procedures, or safeguards to reflect and/or be commensurate with the increased volume of visitors coming onto its properties, especially at Mandalay Bay, notwithstanding its active efforts in soliciting such business.

95.     Likewise, MGM has not updated its security policies, procedures or safeguards to reflect and/or be commensurate with the prevalence of terroristic threats and mass shootings in our society, which many other Las Vegas hotels have done.

96.     In 2015, the Wynn Las Vegas Casino and Hotel ("Wynn Casino") warned other Las Vegas hotels, including Mandalay Bay, that Las Vegas was a "target city" and that Las Vegas hotels needed to dramatically increase their security procedures and protocols in order to

- 24 -

**FIRST AMENDED COMPLAINT**

1  adequately address future threats including gun violence.  The Wynn Casino made such changes
2  in 2015.

3         97.    Although the Wynn Casino instituted a number of significant security
4  enhancements, MGM failed to do the same.  For example, unlike Mandalay Bay, no Wynn Casino
5  guest would be permitted to keep a "Do Not Disturb" sign on a room for more than 12 hours
6  without investigation from the hotel.  The Wynn Casino also required its employees to undergo
7  significant training designed to be on the alert for things out of the ordinary akin to a "see
8  something – say something" policy.  Furthermore, the Wynn Casino has a strict no-gun policy
9  which, unlike Mandalay Bay, is enforced through metal detectors designed to prevent people from
10 bringing guns into the hotel in addition to dozens of armed plain clothed military trained security
11 guards.  Unlike at the Mandalay Bay, the activity the Shooter engaged in prior to October 1, 2017,
12 would have raised a number of alarms at the Wynn Casino, and as a result, the shooting likely
13 never would have occurred.  If MGM had these measures in place, the Shooter's weapons would
   likely have been detected and investigated, and the Mass Shooting never would have occurred.

14        98.    Like the Wynn Casino, many other hotels took action to prevent firearms in its
15 hotels and casino, not by just posting signs and adopting a policy, but by taking action, including
16 but not limited to using trained dogs, installing unseen metal detectors, posting specially trained
17 U.S. Embassy Marines at entrances, having Seal Team Six type former military trained personnel
18 roaming the property to prevent weapons and spot unusual or suspicious activity, participating in
19 intelligence briefings by LVMPD and the counter terrorism fusion center, and instituting 12 hour
20 checks on rooms for guest and property protection purposes when "Do Not Disturb" signs are
21 utilized.  On the other end of the spectrum, MGM merely adopted an unenforced policy of no
22 firearms or weapons and then helped the Shooter, on multiple occasions, use the service elevator,
23 in violation of its own policy, to transport all or a vast majority of the assault rifles, ammunition,
24 and other prohibited items used to carry out the Mass Shooting that harmed Plaintiffs.  If MGM
25 had taken the security measures that many of the other Las Vegas hotels should have had in place,
26 the Shooter's weapons would likely have been detected and investigated, and the Mass Shooting
27 never would have occurred.

28

- 25 -

**FIRST AMENDED COMPLAINT**

99.     The Las Vegas Metropolitan Police Department also foresaw something similar to the Mass Shooting more than six years ago when it implemented MACTAC (Multiple Assault Counter Terrorism Action Capabilities).  In preparation for its heroic response to this Mass Shooting, law enforcement trained every officer to identify and neutralize a wide variety of threats, including a lone wolf Shooter in a shopping mall, **a sniper on the Stratosphere**, and a coordinated attack by a terrorist militia.  Reportedly, plans were developed for how to deal with multiple threat scenarios at every hotel on the Las Vegas Strip, which included MGM's other properties.  For instance, sometime after May 2011 when the Sahara Hotel in Las Vegas closed, the FBI and LVMPD used the property for a training exercise to simulate an event almost identical to the Mass Shooting.  During the training exercise, the FBI and LVMPD placed a mannequin near a window inside one of the high-rise tower rooms to simulate an attacker.

100.    It was foreseeable to MGM that something catastrophic and/or similar to this event could occur, especially if one assisted and allowed an individual to accumulate approximately 22 assault rifles, one long rifle, one handgun, 5,000 rounds of ammunition, homemade gasmasks, sledge hammers, glass cutters, and power tools in its room overlooking a 20,000 person festival.

101.    MGM's industry also foresaw something similar to the Mass Shooting approximately 18 months prior to it actually occurring.

102.    In January 2016, an unfortunately prophetic article appeared in <u>Casino Journal</u> titled, "*The Growing and Changing Role of Casino Surveillance*."  In it, the author notes, "It's no longer all about card cheats and small-time criminals.  It's about ensuring that our employees and guests are not attacked **or shot** . . . Today, security and surveillance teams must be constantly prepared for a critical event or emergency, **such as an active Shooter** . . . This has become a continuing saga, and unfortunately it isn't going away for a while, if it ever does . . . our security and surveillance teams must be prepared to immediately **react properly to an active Shooter**.  **It is, sadly, an event that we may have to handle one day.**  Our world has changed, and so has protecting our casino property."  Therefore, it was foreseeable to MGM that something catastrophic, identical, and/or similar to the Mass Shooting could occur.

103.    MGM knew of industry opinion for potential active or mass shooters in 2013 or 2014 when they began training its "security" personnel on active or mass shooters.  Unfortunately,

**FIRST AMENDED COMPLAINT**

that training was inadequate and/or not followed between September 25 and October 1, 2017, which resulted in the injuries and damages to Plaintiffs.

104.     The events leading up to, in addition to, the Mass Shooting were foreseeable because MGM knew of this industry opinion and had notice and/or knowledge of prior incidents and/or similar wrongful acts occurring on Mandalay Bay premises, including assault and non-assault weapons found and confiscated on the casino floor and nightclubs.

105.     The events leading up to, in addition to, the Mass Shooting were foreseeable because MGM knew of this industry opinion and had notice and/or knowledge of prior incidents and/or similar wrongful acts occurring on Mandalay Bay premises, including assault weapons/firearms found and confiscated in hotel rooms.

106.     The events leading up to, in addition to, the Mass Shooting were foreseeable because MGM knew of this industry opinion and had notice and/or knowledge of prior incidents and/or similar wrongful acts occurring on Mandalay Bay premises, including non-assault weapons/firearms found and confiscated in hotel rooms.

107.     Based on information and belief, MGM had knowledge of one or more active gunman and/or gunfire incidents at Mandalay Bay and/or MGM's other properties prior to the Mass Shooting, showing such incidents were reasonably foreseeable.

108.     Based on information and belief, at the time of the Route 91 event, MGM had active shooter and/or terrorist incident insurance in effect showing such incidents were reasonably foreseeable.  In essence, the insurance industry recognized the risk of active shooters, performed an actuarial analysis of it, and set a price on the cost of coverage.  MGM also recognized the risk, performed a risk benefit analysis on the insurance industry coverage and price, and decided to pay the premium to reduce its risk.  Demonstrating that active shooters at MGM properties were not just foreseeable, but actually foreseen.

109.     The events leading up to, in addition to, the Mass Shooting were foreseeable because MGM knew of this industry opinion and had notice and/or knowledge of prior incidents and/or similar wrongful acts occurring on Mandalay Bay premises, including assault and non-assault weapons found and confiscated in hotel rooms.

- 27 -

**FIRST AMENDED COMPLAINT**

110.    MGM knew of this industry opinion and the need to be prepared for an active shooter. This belief is based on the fact that MGM Defendants and its Executive Director of Corporate Security, Tom Lozich, were featured in the same *Casino Journal* publication as the above referenced article, on pages 21-24.  Lozich describes MGM Resorts as being a "miniature city, with many complex events and operations being simultaneously managed." The article recognizes the Las Vegas Strip in particular as "a target for crime—anything from petty theft to **more nefarious plots**.  Lozich describes MGM's approach to security, "The Corporate Watch Center—now operating 24/7—is a functioning in-house fusion center . . . the Watch Center is a single-stop station for resort personnel (security and other wise) to report suspicious activity, gain insight into trends and connect with corporate resources.  Law enforcement also knows that they can reach out to the Watch Center for information instead of having to chase down appropriate security contact at each resort . . . A dedicated staff of *investigators* at the Watch Center *monitors the properties* and even street views around MGM properties, and they *gather suspicious activity* reporting through the robust "See Something, Say Something initiative in Las Vegas . . . Our 'See Something, Say Something" messaging is still non-stop for our employees.  At the line level, those are the employees who can make or break anything that happens." Finally, Lozich recognizes, "We're a global company, and we have to be mindful of the security risks in the world that could impact not only our ability to function but (our ability) to protect our guests."

111.    It was not just foreseeable to MGM that something catastrophic and/or similar to this nefarious plot could occur, it was actually foreseen by Las Vegas Metro Police, the Las Vegas Casino industry, the insurance industry, and MGM.  Unfortunately, MGMs' centralized corporate policy delayed immediate Shooter information being transmitted to law enforcement, which caused and/or contributed to Plaintiffs' injuries and damages.

112.    The online resource *Insurance Journal* and the Federal Emergency Management Agency ("FEMA") define an "active shooter incident" as "one or more individuals actively engaged in killing or attempting to kill people in a populated area."[1]  The Federal Bureau of

---

[1] Amy O'Connor, *As Active Shooter Incidents Increase, Industry Addresses Coverage 'Gray Area'*, INSURANCE JOURNAL (Aug. 11, 2016), https://www.insurancejournal.com/news/national/2016/08/11/422884.htm (last visited

**FIRST AMENDED COMPLAINT**

Investigation ("FBI") conducted a study of Active Shooter Incidents focusing on the years 2000 through 2013 and found that the "largest percentage of active shooter incidents – 45.6 percent – took place in a business."[2]  The FBI concluded that due to the growing number of active shooting incidents, there must be strong prevention efforts" by these businesses.[3]  The FBI then followed this report with a 2016 "analysis of 2014 and 2015 active shooter incidents" which found that the number of incidents was increasing each year, totaling 20 incidents per year in 2014 and 2015.[4]

113.    Many insurance companies now offer active shooter insurance programs to respond to these emerging risks.[5]  Some of the insurance policies available have "onsite active shooter and security vulnerability assessment, as well as preparedness seminars and training modules" for businesses.[6]

114.    The Department of Homeland Security ("DHS") and FEMA have been providing courses to assist "managers and employees" of businesses to address and prevent active shooter situations for several years now.[7]

115.    Less than one year before the Mass Shooting, the FBI and DHS published a Joint Special Event Threat Assessment report warning of the potential threat of lone offenders targeting mass gatherings, like music venues in Las Vegas.  The report states that lone offenders "are of particular concern due to their ability to remain undetected until operational; their willingness to attack civilians and soft targets; their ability to inflict significant casualties with weapons that do not require specialized knowledge, access, or training; and their unpredictability . . . ."

---

March 23, 2018); *see also* FEMA, *IS-907: Active Shooter; What You Can Do*, available at https://training.fema.gov/is/courseoverview.aspx?code=IS-907 (last visited March 23, 2018).
[2] FBI, *FBI Releases Study on Active Shooter Incidents* (September 24, 2014), https://www.fbi.gov/news/stories/fbi-releases-study-on-active-shooter-incidents (last visited March 23, 2018).
[3] *Id.*
[4] FBI, *Active Shooter Incidents in the United States in 2014 and* 2015, https://www.fbi.gov/file-repository/activeshooterincidentsus_2014-2015.pdf/view (last visited March 23, 2018); see also *As Active Shooter Incidents Increase, Industry Addresses Coverage 'Gray Area'*, *supra* note 1.
[5] *As Active Shooter Incidents Increase, Industry Addresses Coverage 'Gray Area'*, *supra* note 1.
[6] *Id.*
[7] DHS, *Active Shooter Presentation*, https://www.dhs.gov/active-shooter-preparedness (last visited March 23, 2018); DHS, *Human Resources or Security Professional*, https://www.dhs.gov/human-resources-or-security-professional (last visited March 23, 2018); *IS-907: Active Shooter; What You Can Do*, supra note 1.

- 29 -

**FIRST AMENDED COMPLAINT**

116.   Dating back to at least 2005, the Nevada Homeland Security Commission has warned Las Vegas hotels and casino security staff that they should keep an eye out for a potential attack.

117.   Given the numerous incidents involving active shooters in the country, the risk of being hurt or killed in an "Active Shooter" situation/incident became the focus of the National Safety Council during National Safety Month in June of 2017.[8]   The National Safety Council reiterated the DHS's urging that businesses, including their managers and employees, be alert and aware of warning signs to prevent an active shooter situation as well as how to act during an active shooter situation because these incidents are often over within minutes, and sometimes before law enforcement even arrives on scene.[9]

118.   The DHS and the FBI believe that individuals and establishments such as hotels, hospitals, and schools need to be prepared for an active shooter situation.[10]

119.   The Centers for Disease Control ("CDC") and the National Institute for Occupational Safety and Health ("NIOSH") also urged employers to prepare for active shooters. NIOSH's "Vision" is "Safer, Healthier Workers" and its "Mission" is "[t]o develop new knowledge in the field of occupational safety and health and to transfer that knowledge into practice."[11]   Specifically, during "safety month" (June 2017), NIOSH put together a plan for each week of the month to "Help Put an End to Preventable Deaths" with the third week entirely dedicated to dealing with active shooters which it believes "is something every organization needs to address."[12]   One suggestion made is for businesses to have "active shooter drills" to protect people.[13]

---

[8] NCS, *Know how to respond to an active shooter* (June 27, 2017),
http://www.safetyandhealthmagazine.com/articles/15872-know-how-to-respond-to-an-active-shooter (last visited March 23, 2018).
[9] *Id.*
[10] *Active Shooter Incidents in the United States in 2014 and* 2015, *supra* note 4; see also *As Active Shooter Incidents Increase, Industry Addresses Coverage 'Gray Area'*, *supra* note 1.
[11] CDC, *About NIOSH*, https://www.cdc.gov/niosh/about/default.html (last visited March 23, 2018).
[12] CDC, *Help Put an End to Preventable Deaths During National Safety Month 2017* (June 1, 2017),
https://blogs.cdc.gov/niosh-science-blog/2017/06/01/national-safety-month-2017/ (last visited March 23, 2018).
[13] *Id.*

- 30 -

**FIRST AMENDED COMPLAINT**

120.     Despite so many organizations, such as the National Safety Council, CDC, DHS, FBI, and other agencies joining together to work towards preventing serious injuries and deaths caused by active shooters, as well as providing training to businesses to assist them in dealing with their response to active shooters, MGM failed to have adequate and effective plans, policies, and procedures in place to deal with an active shooter.

121.     Upon information and belief, in the timeframe immediately leading up to Mass Shooting, MGM significantly reduced its workforce, including, but not limited to, security personnel.

122.     Because of MGM's inadequate security measures:

    a.   A single guest can check into multiple rooms, including under another person's name, without that named person ever appearing at the hotel;

    b.   A single guest can carry seven large, heavy bags and suitcases containing assault rifles and ammunition at a time, and request to avoid the public elevators without MGM's concern;

    c.   Over the course of several days, a single guest can carry approximately 25 bags and suitcases into his room containing an arsenal of weapons, with MGM's help and without MGM's concern; and

    d.   Prior to the shooting and up to the present, anyone (patrons or non-patrons), with or without the consent or escort of MGM, can use service elevators for whatever purpose they choose, including to move oversized or numerous pieces of luggage, necessarily removing patrons from the normal security protocols in place at the hotel and against MGM's security policy.

123.     MGM's security measures are woefully deficient in dealing with the large number of guests visiting the property.  As a result, this enabled, and continues to enable, individuals to bring prohibited items onto the property such as explosives, ammunition, and/or firearms. Additionally, this enabled, and continues to enable, individuals to engage in prohibited activities and use dangerous items while on MGM's premises.

- 31 -

**FIRST AMENDED COMPLAINT**

124.     MGM's systemic security failures enabled and contributed to the Shooter bringing and using dangerous, prohibited items while on the premises.

125.     But for these inadequate and defective security policies, procedures, and safeguards employed by MGM, among other negligent conduct, the Mass Shooting would not and could not have occurred.

126.     But for MGM's reduction in security personnel, among other negligent conduct, the Mass Shooting would not and could not have occurred.

127.     But for MGM's failure to intervene, among other negligent conduct, Plaintiffs would not have been injured or killed.

128.     But for MGM's failure to take basic minimum precautions that are reasonably expected from a hotel owner, among other negligent conduct, Plaintiffs would not have been injured or killed.

129.     But for MGM deliberately focusing on identifying instances of theft, recovering lost monies stolen from the casino, watching money during scheduled pit drops and slot drops, and other acts that may affect its profits, Plaintiffs would not have been injured or killed.

130.     But for MGM's failure to exercise due care, among other negligent conduct, Plaintiffs would not have been injured or killed.

**D.  MGM's Joint Venture Prioritized Profit Over Security**

131.     MGM Resorts International holds itself out as the leading hospitality and entertainment company in the world.

132.     Upon information and belief, MGM sought, and continues to seek, to diversify its non-gaming revenues by obtaining a larger share of the entertainment segment in order to drive profit growth.

133.     As gaming revenues stagnate, decline and/or underperform, MGM has an interest, and continues to have interest, in the live entertainment market segment, particularly outdoor music festivals.

**FIRST AMENDED COMPLAINT**

134.    Following the success of other competing music festivals held in Las Vegas, MGM converted a warehoused property originally envisioned for a resort hotel into real estate that could be used to generate revenue at a fraction of that cost.

135.    Upon information and belief, MGM Resorts Festival Grounds owned, operated and/or maintained the Las Vegas Village that hosted the Route 91 Festival, at the direction of Defendant MGM Resorts' International.

136.    Upon information and belief, and on or around that same timeframe, Defendants entered and participated in a joint venture when it promoted, organized, marketed, hosted, secured, and/or otherwise held the Route 91 Festival, which Rachel Sheppard, Stephanie Fraser, Brian Fraser, Jovanna Calzadillas, Francisco Calzadillas, Nicholas Robone, and Anthony Robone attended.  Specifically:

  a.  MGM individually, and as co-venturers, entered into a contractual relationship with one another – in the nature of an informal partnership – for purposes of organizing, hosting, marketing, securing, and/or otherwise holding the Route 91 Festival;

  b.  MGM individually, and as co-venturers, conducted a business enterprise by promoting, organizing, marketing, hosting, securing, and/or otherwise holding the Route 91 Festival; and

  c.  MGM, each of them, and as co-venturers, agreed to share jointly, or in proportion to capital contributed, in profits and losses from the Route 91 Festival.

137.    Upon information and belief, and as part of the joint venture, MGM Resorts Festival Grounds provided the land for MGM to hold the Route 91 Festival and/or MGM Resorts Venue Management served as the event promotor of the Route 91 Festival.

138.    As part of the joint venture, MGM's properties served as the official hotels for concert attendees also advertising marketing, and/or promoting the Route 91 Festival in and outside of their respective premises.  This included giving free tickets to its hotel patrons and/or guests, providing exclusive hotel discounts only available to concert attendees, and providing transportation to and from the hotel/concert venue.

- 33 -

**FIRST AMENDED COMPLAINT**

139.     MGM was acutely aware that music festivals historically lose money in their inaugural years of operation. "You've got to have a lot of stomach to put these big festivals on knowing that you will lose money in the first two to three years," stated Chris Baldizan, MGM Resorts International Senior Vice President.[14] "We invested some money into the site — it was essentially a run-down parking lot. We put some power in the venue, we paved it and cleaned it up. But there's nothing really permanent on the site," according to Mr. Baldizan.[15]

140.     It is believed that MGM invested, and continues to invest, minimal amounts for the venue, instead putting the majority of financial resources into attracting high caliber talent to perform at the event at the expense of patron security. Such minimal investment includes, but is not limited to, the following:

    a.   Temporary chain link fencing around the perimeter of the venue;

    b.   Insufficient number of entrances for ingress/egress;

    c.   The absence of permanent signage denoting specific areas of ingress and egress (*i.e.* emergency exits); and/or

    d.   An accessible communication system for public use when ordinary communications are unavailable (*i.e.* emergency sirens).

141.     As a result of MGM's conscious decision to invest more on talent and less on the venue itself, the Las Vegas Village ultimately was, and continues to be, an inherently unsafe venue susceptible to any type of mass casualty event whether a natural disaster, fire and/or act of terrorism.

142.     MGM's inadequate security at the venue caused and/or contributed to the endless injuries and deaths that occurred on 1 October, including Plaintiffs.

---

[14] https://lasvegassun.com/blogs/kats-report/2016/apr/01/festival-grounds-has-a-cause-it-needs-more-parties/ (Last visited on January 5, 2018).
[15] http://ampthemag.com/the-real/qa-chris-baldizan-mgm-resorts-international/ (Last visited on January 5, 2018).

- 34 -

**FIRST AMENDED COMPLAINT**

143.   Upon information and belief, and at all times relevant herein, Defendants were responsible for hiring, managing, training, and/or supervising event staff working at the Las Vegas Village.

144.   Pursuant to local codes and/or ordinances, Defendants were required to obtain an outdoor festival permit in order to hold the Festival. As permit holders, Defendants were required to meet certain conditions prior to holding such an event, which included submitting a detailed security plan.

145.   That Defendants, each of them, collaborated, discussed, organized, drafted and/or otherwise prepared a security plan for the Festival.

146.   A detailed security plan necessarily includes an emergency evacuation plan as well as policies and procedures in handling a mass casualty event, if and when it occurs.

147.   MGM failed to reasonably hire staff with the requisite experience and/or to properly train them in executing an emergency evacuation plan and responding to a mass casualty event. Such failures include, but are not limited to, the following:

   a.   Not communicating, instructing, directing, assisting and/or guiding concert attendees to designated exits during an emergency; and/or

   b.   Not executing an emergency evacuation plan to allow concert attendees to evacuate the premises.

148.   As a result, this curtailed, stopped and/or prevented concert attendees, including Plaintiffs, from reasonably exiting and/or escaping from the venue: (1) once the shooting began; (2) at each interval when the shooter paused to reload or switch weapons; (3) and/or at the end of the massacre. Instead, Plaintiffs, each of them, were forced to seek shelter from a barrage of bullets while essentially imprisoned within a chain-link cage.

149.   MGM, each of them, and as co-venturers, are jointly and severally liable to Plaintiffs for the wrongful acts and conduct committed in furtherance of the joint venture.

150.   That MGM's negligent acts, omissions, and conduct in organizing, hosting, marketing, securing, and/or otherwise holding the Route 91 Festival is imputed to each and every

- 35 -

**FIRST AMENDED COMPLAINT**

co-venturer of the joint enterprise rendering those participating in the joint venture liable for Plaintiffs' injuries.

151.   But for MGM's failures, the events of 1 October would not, should not, and could not have occurred.

## CLAIMS FOR RELIEF

## **FIRST CLAIM FOR RELIEF**

### Negligence

152.   Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

153.   At all relevant times, MGM had a duty of reasonable care in the protection and safeguarding of persons on the Mandalay Bay, MGM premises and Las Vegas Village, including persons in attendance at the Route 91 Festival venue, and the properties and areas leading to and from the festival.

154.   At all relevant times, MGM had a duty of reasonable care to prevent firearms and/or weapons from being allowed on the Mandalay Bay premises, including, but not limited to, rooms 32-135 and 32-134.

155.   At all relevant times, MGM knew or should have known that it was reasonably foreseeable that a breach of its duties to keep its premises reasonably safe and free from firearms and weapons would result in injury or death to its guests.

156.   This is especially true where MGM allowed a single guest to carry approximately 25 bags and suitcases containing approximately 22 assault rifles, one long rifle, one handgun, 5,000 rounds of ammunition, tripods, homemade gas masks, power tools, glass cutters, and sledge hammers into one or two rooms of its Mandalay Bay hotel, which overlooked a concert with at least 20,000 attendees that MGM promoted to its guests.

157.   MGM breached its duty of reasonable care by failing to maintain the Mandalay Bay premises in a reasonably safe condition, including, but not limited to, the following:

        a.   failing to properly surveil people coming and going from the hotel;

        b.   failing to monitor the hotel premises with a closed-circuit television;

- 36 -

**FIRST AMENDED COMPLAINT**

c.   failing to discover some or all of the Shooter's arsenal of weapons, ammunition, explosive material or other prohibited items between between September 25, 2017 and October 1, 2017;

d.   assisting the Shooter with transporting all or part of his arsenal of weapons, ammunition, explosive material and other prohibited items between September 25, 2017 and October 1, 2017, through the nonpublic service elevator;

e.   assisting the Shooter on September 29, 2017, with checking into a second suite in his girlfriend's name, despite the Shooter staying alone;

f.   failing to conduct any investigation into a single individual that carried approximately 25 bags and suitcases into two rooms, which oversaw the Route 91 Festival grounds owned by MGM (in which he stayed in alone);

g.   failing to timely respond to, or otherwise act upon, the Shooter's internal shooting at Mandalay Bay, including, but not limited to, the shooting of Mandalay Bay security guard Jesus Campos (who waited nearly one hour before going to the 32nd floor after receiving an alert coming from another guests' room);

h.   failing to notice or take precautions against the Shooter's delivery of guns, ammunition, explosive material, and other prohibited items to his hotel room;

i.   failing to notice or take action against the Shooter's installation and setup of surveillance cameras outside his hotel rooms;

j.   failing to adequately prevent, respond or timely discover the Shooter's breaking out and opening of the Mandalay Bay hotel room windows;

k.   failing to adequately train and supervise employees on the reporting and discovery of suspicious individuals, persons, and/or activities;

l.   failing to adequately train and supervise employees as recommended by the National Safety Council, CDC, DHS, and FBI;

- 37 -

**FIRST AMENDED COMPLAINT**

m.  failing to investigate the Shooter's room after a "Do Not Disturb" sign remained on the Shooter's door for more than 12 hours;

n.  failing to investigate the Shooter's room after a "Do Not Disturb" sign remained on the Shooter's door for more than 36 hours;

o.  failing to timely discover the stairwell door bolted closed;

p.  failing to discover and/or investigate the use of power tools by the Shooter, which modified the Hotel Premises;

q.  failure of MGM personnel to discover and report the arsenal of weapons, ammunition, explosive material and other prohibited items in the Shooter's rooms;

r.  failing to report the arsenal of weapons, ammunition, explosive material and other prohibited items discovered by MGM personnel servicing the room and its hotel gusts;

s.  failing to respond to reports of the arsenal of weapon, ammunition, explosive material, and other prohibited items discovered by MGM personnel servicing the room and its hotel guests;

t.  failure of room service/in room dining personnel to discover and report the arsenal of weapon, ammunition, explosive material, and other prohibited items in the Shooter's suite;

u.  failing to report the arsenal of weapons, ammunition, explosive material, and other prohibited items discovered by MGM personnel servicing the room and its hotel guests;

v.  failing to respond to reports of the arsenal of weapon, ammunition, explosive material, and other prohibited items discovered by MGM personnel servicing the room and its hotel guests;

w.  failing to discover or investigate explosive material in the Shooter's vehicle;

x.  failing to employ adequate safety measures;

y.  failing to exercise due care;

- 38 -

**FIRST AMENDED COMPLAINT**

z.   failing to take minimal safety precautions to ensure the safety of guests on its premises;

aa.  delaying the notification of law enforcement of the Shooter's activity and/or location;

bb.  failing to adequately and promptly notify law enforcement of the Shooter and/or his activities;

cc.  failing to have a plan for an active Shooter;

dd.  failing to properly respond to an active Shooter situation;

ee.  failing to properly train and supervise employees, contractors, vendors, guests of the plan of action in case of an active Shooter situation;

ff.  failing to properly respond to an emergency situation;

gg.  failing to properly implement and execute active Shooter plan.

158.   MGM further breached its duty of reasonable care by failing to maintain the Las Vegas Village in a reasonably safe condition, including, but not limited to, for having as follows:

a.  Temporary chain link fencing around the perimeter of the venue;

b.  Insufficient number of entrances for ingress/egress;

c.  The absence of permanent signage denoting specific areas of ingress and egress (*i.e.* emergency exits); and/or

d.  An accessible communication system for public use when ordinary communications are unavailable (*i.e.* emergency sirens).

159.   MGM failed to reasonably hire staff with the requisite experience and/or to properly train them in executing an emergency evacuation plan and responding to a mass casualty event, including, but are not limited to:

a.  Communicating, instructing, directing, assisting and/or guiding concert attendees to designated exits during an emergency; and/or

b.  Executing an emergency evacuation plan to allow concert attendees to evacuate the premises.

- 39 -

**FIRST AMENDED COMPLAINT**

160.     MGM is further liable for the negligence of its employees pursuant to the doctrine of *respondeat superior*, and the negligence of its agents under the doctrine of vicarious liability.

161.     Based on the totality of the circumstances surrounding the Shooter's September 25, 2017 to October 1, 2017 stay at Mandalay Bay, MGM knew, or should have known, that it was foreseeable that the Shooter could cause harm to someone on and/or adjacent to its premises.

162.     That MGM acted recklessly, maliciously, and/or oppressively with intent to allow injury to Plaintiffs.

163.     That MGM's failures amount to a conscious disregard for the safety of Plaintiffs, and others so as to constitute malice and oppression, and Plaintiffs are entitled to exemplary or punitive damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

164.     As a direct and proximate result of MGM's wrongful conduct, Plaintiffs, each of them, suffered severe injury to their body and mind, past and future medical expenses, past and future pain and suffering, past and future severe emotional distress, disfigurement, loss of enjoyment of life, loss of past and future earning capacity and anticipated future loss of income, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

165.     As a direct and proximate result of MGM's wrongful conduct, and the resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet ascertained, and when said amount is ascertained, Stephanie Fraser will seek leave of Court to amend this Complaint to allege said amount.

166.     The Estate of Brian Fraser is also entitled to general damages and exemplary or punitive damages that decedent Brian Fraser would have recovered had he survived.

167.     Due to MGM's wrongful conduct as alleged herein, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

168.     Due to MGM's wrongful conduct, as alleged herein, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

- 40 -

**FIRST AMENDED COMPLAINT**

169.   Due to MGM's wrongful conduct as alleged herein, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

170.   Due to MGM's wrongful conduct as alleged herein, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

171.   Due to MGM's negligence as alleged herein, Nicholas and Anthony Robone have been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

### SECOND CLAIM FOR RELIEF

#### Negligence Against Defendant MGM Resorts International

172.   Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

173.   At all times herein mentioned, Defendant MGM Resorts International, undertook, gratuitously and for consideration, to render services to Mandalay Bay and to Plaintiffs and Plaintiff's' Decedents, which Defendant MGM Resorts International should have recognized, and did recognize, as necessary for the protection of third persons, including Plaintiffs and Plaintiff's' Decedents.   Specifically, Defendant MGM Resorts International undertook to provide comprehensive and centralized security procedures, protocols, communications and affirmative protective actions in response to security and safety threats to guests, patrons, and members of the public at the various resorts, hotels and associated properties.

174.   In doing so, the Defendant MGM Resorts International knew that its failure to exercise reasonable care in the performance and rendering of this undertaking would increase the risk of harm to third persons, including Plaintiffs and Plaintiff's' Decedents, and that they would be subjected to physical harm thereby. Defendant MGM Resorts International also knew that it was undertaking performance of duties of care owed by Mandalay Bay to Plaintiffs and Plaintiff's' Decedents, and that Plaintiffs and Plaintiff's' Decedents upon the undertaking.

175.   Defendant MGM Resorts International was negligent and failed to exercise reasonable care in the performance and rendering of this undertaking by, among other things, and

- 41 -

### FIRST AMENDED COMPLAINT

not by way of limitation, removing security authority from Mandalay Bay and centralizing such security authority to a "single stop station" "Corporate Watch Center" off premises, thereby diminishing localized control and the ability of Mandalay Bay to immediately and promptly communicate with law enforcement, resulting in critical delays in communication to law enforcement personnel, and delaying the time for them to respond and arrive at the scene of the shooting.

176.   As a direct and proximate result of MGM Resorts International's breach of its duty of reasonable care, and failure to exercise reasonable care in the performance of said undertaking, Plaintiffs and Plaintiff's' Decedents suffered the injuries and damages as herein alleged.

### THIRD CLAIM FOR RELIEF

#### Loss of Consortium

177.   Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

178.   Stephanie Fraser and decedent Brian Fraser were, at all times relevant to this action, husband and wife, having entered into a legally valid marriage.

179.   That Plaintiff, Stephanie Fraser, as the lawful wife of Plaintiff, Brian Fraser, was, and is, entitled to the society, comfort, affection, services, companionship and consortium of her husband.

180.   That as a direct and proximate result, of the negligence of the Defendants, and each of them, Plaintiff Brian Fraser, was killed, thereby denying Plaintiff, Stephanie Fraser, the society, comfort, affection, services, companionship and consortium of her husband, all to her general damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

181.   Due to MGM's wrongful conduct as alleged herein, Stephanie Fraser has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

182.   Jovanna Calzadillas and Francisco Calzadillas were, at all times relevant to this action, husband and wife, having entered into a legally valid marriage.

- 42 -

**FIRST AMENDED COMPLAINT**

183.    That Plaintiff, Francisco Calzadillas, as the lawful husband of Plaintiff, Jovanna Calzadillas, was, and is, entitled to the society, comfort, affection, services, companionship and consortium of his wife.

184.    That as a direct and proximate result, of the negligence of the Defendants, and each of them, Plaintiff Jovanna Calzadillas, was injured, thereby denying Plaintiff, Francisco Calzadillas, the society, comfort, affection, services, companionship and consortium of her husband, all to his general damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

185.    Due to MGM's wrongful conduct as alleged herein, Francisco Calzadillas has been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

## FOURTH CLAIM FOR RELIEF

### Wrongful Death

186.    Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

187.    Pursuant to Nevada Revised Statute ("NRS") 41.085(2), "[w]hen the death of any person ... is caused by the wrongful act or neglect of another, the heirs of the decedent and the personal representatives of the decedent may each maintain an action for damages against the person who caused the death . . . ."

188.    That as a direct and proximate result of the negligence of Defendants, and each of them, Brian Fraser, the decedent, suffered fatal injuries and Plaintiffs have sustained damages in excess of Fifteen Thousand Dollars ($15,000.00).

189.    That as a further direct and proximate result of Defendants' negligence, acts and omissions, from the time of the Decedent's injuries until his death, Decedent suffered intense physical and metal pain disfigurement, shock and agony, all to his damage recoverable by Plaintiffs, in an amount to be determined at trial.

190.    That Defendants, each of them, acted recklessly, maliciously, and/or oppressively with intent to allow injury to the Decedent.  That Defendants' failures amount to a conscious disregard for the safety of Decedent and others, so as to constitute malice and oppression.  For the

- 43 -

**FIRST AMENDED COMPLAINT**

reasons set forth above, Plaintiffs are entitled to exemplary damages in an amount to be determined at trial.

191.   Stephanie Fraser as the surviving spouse of decedent Brian Fraser;  Lotus Herrera as the Special Administrator for the Estate of Brian Fraser; Stephanie Fraser as Guardian Ad Litem for Aubree Fraser, a minor child of decedent Brian Fraser; and Stephanie Fraser as Guardian Ad Litem for Brayden Fraser, a minor child of decedent Brian Fraser, are heirs to decedent Brian Fraser and are entitled to maintain an action for damages against Defendants for wrongful death, including, but not limited to, damages set forth in N.R.S. 41.085 in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

192.   As a result of the injuries to and resulting death of Brian Fraser, Stephanie Fraser, Aubree Fraser, and Brayden Fraser are entitled to pecuniary damages for their grief or sorrow, loss of probable support, companionship, society, comfort and consortium, and damages for pain, suffering or disfigurement of the decedent.

193.   As a result of the injuries to and death of Brian Fraser,  Lotus Herrera as Special Administrator to the Estate of Brian Fraser may recover any special damages, such as medical expenses, which the decedent Brian Fraser incurred or sustained before his death, and funeral expenses; and any penalties including, but not limited to, exemplary or punitive damages, that decedent Brian Fraser would have recovered if he had survived.

194.   Due to MGM's negligence and wrongful conduct, Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

### FIFTH CLAIM FOR RELIEF

#### Premises Liability

195.   Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

196.   At all times mentioned, MGM was the owner, manager, supervisor, maintainer, operator, and/or controller of the premises and common area known as Las Vegas Village located at 3901 South Las Vegas Boulevard, Las Vegas, NV 89119.

- 44 -

**FIRST AMENDED COMPLAINT**

197.     At all times mentioned herein, MGM was the owner, manager, supervisor, maintainer, operator, and/or controller of the premises and common area known as Mandalay Bay located at 3950 South Las Vegas Boulevard, Las Vegas, NV 89119.

198.     At all times mentioned herein, Mandalay Bay was located adjacent to and connected with other MGM hotels, including, but not limited to, Excalibur, Delano, and Luxor.

199.     At all times mentioned herein, and upon information and belief, Mandalay Bay shares a common security management and record keeping systems with other MGM hotels, including, but not limited to, Excalibur, Delano, and Luxor.

200.     At all times mentioned herein, the Las Vegas Village was a part of the premises of Mandalay Bay and MGM's other hotels, as defined in N.R.S. 651.005, because it is a "recreational facility or other land, used or maintained in connection with the [Mandalay Bay] hotel" and MGM's other hotels.

201.     At all times mentioned herein, MGM owed a duty of care to concert-goers and hotel guests like Plaintiffs.

202.     At all times mentioned herein, MGM failed to exercise due care for the safety of Plaintiffs.

203.     At all times mentioned herein, MGM negligently failed to reasonably secure, inspect, maintain, and/or supervise said premises, failed to keep said premises reasonably safe, and further failed to protect Plaintiffs from dangers and/or hazards, which resulted in Plaintiffs' injuries.

204.     As a direct and proximate cause of MGM's failures, omissions, and wrongful conduct, Plaintiffs sustained numerous injuries, as alleged herein.

205.     MGM negligently, willfully, and/or recklessly failed to perform certain responsibilities and duties owed to Plaintiffs, inter alia:

   a.   By failing to exercise due care for the safety of its patrons, ignoring countless signs of suspicion that, if noticed, would have prevented, or significantly thwarted, the Shooter's efforts;

   b.   By failing to have adequately trained or competent personnel on duty, including security guards and/or hotel personnel, at the time of the attack to respond adequately to the shooting;

- 45 -

**FIRST AMENDED COMPLAINT**

c.  By failing to install and/or properly use monitoring equipment or audio equipment on the premises to discover, or even investigate, the Shooter;

d.  By focusing its security efforts on instances of theft against the casino, and not on the safety of its patrons;

e.  By failing to establish and enforce such other measures necessary and reasonable to protect Plaintiffs from physical attack and death, thereby failing to provide a reasonably safe venue; and

f.  By failing to enforce its own policies and procedures.

206.    MGM breached its duty to Plaintiffs to maintain a reasonably safe environment, and acted negligently by failing to provide adequate security for the premises.

207.    MGM knew or should have known that the lack of staffing and inadequate security policies and procedures made it susceptible to cause the injuries to Plaintiffs, and should have warned Plaintiffs of such risks.

208.    Prior to the events of the Mass Shooting, the inherently unsafe condition of the premises was known by, or should have been known by, MGM, in the exercise of reasonable care.

209.    MGM knew or should have known that the failure to develop, monitor, operate and/or control the premises in a reasonable safe manner made it susceptible to a mass casualty event that could lead to injury and/or death of those at its premises including, but not limited to, those in attendance of the Route 91 Festival.

210.    The injuries to Plaintiffs were proximately caused by MGM's failure to properly staff and maintain adequate security policies and procedures for its premises, among other things.

211.    As a direct and proximate result of MGM's wrongful conduct, Plaintiffs, each of them, suffered severe injury to their body and mind, past and future medical expenses, past and future pain and suffering, past and future severe emotional distress, disfigurement, loss of enjoyment of life, loss of past and future earning capacity and anticipated future loss of income, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

212.    As a direct and proximate result of MGM's wrongful conduct, and the resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet ascertained, and

- 46 -

**FIRST AMENDED COMPLAINT**

when said amount is ascertained, Stephanie Fraser will seek leave of Court to amend this Complaint to allege said amount.   Lotus Herrera as Special Administrator of the Estate of Brian Fraser is also entitled to general damages and exemplary or punitive damages that decedent Brian Fraser would have recovered had he survived.

213.   Due to MGM's negligent and wrongful conduct, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

214.   Due to MGM's negligent and wrongful conduct, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

215.   Due to MGM's negligent and wrongful conduct, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

216.   Due to MGM's negligent and wrongful conduct, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

217.   Due to MGM's negligent and wrongful conduct, Nicholas Robone has been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

### SIXTH CLAIM FOR RELIEF

#### Negligent Infliction of Emotional Distress

218.   Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

219.   MGM owed a duty to exercise due care not to subject Plaintiffs to foreseeable risk of mental, emotional and/or physical injury, and MGM knew or reasonably should have known that such acts and/or omissions of MGM as herein alleged, were likely to result in mental, emotional and/or physical injury to Plaintiffs.

- 47 -

**FIRST AMENDED COMPLAINT**

220. MGM while engaging in the aforementioned conduct did negligently inflict extreme mental and emotional distress, indignity, embarrassment, and humiliation upon Plaintiffs, and did breach that duty to Plaintiffs.

221. Rachel Sheppard suffered and continues to suffer serious emotional distress and physical injuries due to the negligence of MGM.

222. Stephanie Fraser suffered and continues to suffer serious emotional distress resulting in physical symptoms caused by both her physical and emotional injuries as well as those resulting from her witnessing the shooting and eventual death of her decedent husband Brian Fraser.

223. Francisco Calzadillas suffered and continues to suffer serious emotional distress resulting in physical symptoms caused by the Mass Shooting and witnessing his spouse get shot in the head, due to the negligence of MGM.

224. Anthony Robone suffered and continues to suffer serious emotional distress resulting in physical symptoms caused by the Mass Shooting, due to the negligence of MGM.

225. Plaintiffs have suffered and continue to suffer serious emotional distress causing physical injury and illness as a result of the negligence and wrongful conduct of MGM, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

226. Due to MGM's negligent and wrongful conduct, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

227. Due to MGM's negligent and wrongful conduct, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

228. Due to MGM's negligent and wrongful conduct, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

229. Due to MGM's negligent and wrongful conduct, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

**FIRST AMENDED COMPLAINT**

230.    Due to MGM's negligent and wrongful conduct, Nicholas and Anthony Robone have been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

## SEVENTH CLAIM FOR RELIEF

### Negligence Per Se

231.    Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

232.    At all times mentioned herein, there were in force statutes, ordinances, and regulations prohibiting the conduct exhibited by MGM, including without limitation Chapter 6.67 *et seq.* of the Clark County Code of Ordinances.

233.    The acts of MGM, as alleged herein, violated the statutes, ordinances, and regulations which constitutes negligence per se.

234.    Plaintiffs were all members of the class of persons for whose protection said statutes, ordinances, and regulations were enacted or promulgated.

235.    Plaintiffs sustained injuries that were the type said statutes, ordinances, and regulations were intended to prevent.

236.    MGM is liable for the damages sustained by Plaintiffs.

237.    As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of MGM, Plaintiffs have sustained physical, mental, and emotional harm.

238.    The wrongful conduct, acts, or omissions were conducted in a wanton, willful, malicious manner, with conscious disregard for Plaintiffs' rights.

239.    The acts of MGM should be assessed punitive or exemplary damages.

240.    As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of MGM, Plaintiffs have sustained and will continue to sustain the above-mentioned injuries.

241.    As a direct and proximate result of MGM's wrongful conduct, Plaintiffs, each of them, suffered severe injury to their body and mind, past and future medical expenses, past and future pain and suffering, past and future severe emotional distress, disfigurement, loss of

- 49 -

enjoyment of life, loss of past and future earning capacity and anticipated future loss of income, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

242.    As a direct and proximate result of MGM's wrongful conduct, and the resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet ascertained, and when said amount is ascertained, Stephanie Fraser will seek leave of Court to amend this Complaint to allege said amount.   Lotus Herrera as Special Administrator of the Estate of Brian Fraser is also entitled to general damages and exemplary or punitive damages that decedent Brian Fraser would have recovered had he survived.

243.    Due to MGM's wrongful conduct, acts and omissions, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

244.    Due to MGM's wrongful conduct, acts and omissions, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

245.    Due to MGM's wrongful conduct, acts and omissions, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

246.    Due to MGM's wrongful conduct, acts and omissions, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

247.    Due to MGM's wrongful conduct, acts and omissions, Nicholas and Anthony Robone have been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

### EIGHTH CLAIM FOR RELIEF

**Nuisance**

248.    Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

**FIRST AMENDED COMPLAINT**

249.     Plaintiffs were ticket holders with the right to occupy, attend, and/or otherwise be present at the venue for the Route 91 Festival, including grounds and adjacent property controlled and owned by MGM.

250.     MGM, by way of its acts and omissions, created and/or permitted an ongoing condition, namely MGM's failure in operating a high traffic resort hotel without adequate security measures in place to detect, identify, and/or otherwise prevent patrons with dangerous weapons from coming onto its premises.

251.     The existence of that ongoing condition was harmful to Plaintiffs' health, safety and welfare so as to substantially interfere with Plaintiffs' comfortable enjoyment of life.

252.     This condition substantially interfered with Plaintiffs' use of the hotel and concert venue, including enjoyment of the Route 91 Festival and Plaintiffs did not consent to MGM's conduct.

253.     An ordinary person would be disturbed by MGM's conduct.

254.     MGM's failure in operating its business without adequate security measures in place was a substantial factor in causing Plaintiffs' harm.

255.     The seriousness of the harm outweighed the public benefit of MGM's conduct, namely that MGM must enact, develop and/or implement reasonable security measures so patrons in close proximity to such business operations will not be unreasonably harmed as a result.

256.     As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of MGM, Plaintiffs have sustained damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00), both individually and collectively.

257.     That at all times mentioned herein, MGM acted with fraud, oppression, and/or malice toward Plaintiffs, exhibited a recklessness to injure Plaintiffs and/or a conscious disregard for the rights and safety of Plaintiffs, and MGM should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

258.     As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of MGM, Plaintiffs have sustained and will continue to sustain the above-mentioned injuries.

**FIRST AMENDED COMPLAINT**

259.    As a direct and proximate result of MGM's wrongful conduct, Plaintiffs, each of them, suffered severe injury to their body and mind, past and future medical expenses, past and future pain and suffering, past and future severe emotional distress, disfigurement, loss of enjoyment of life, loss of past and future earning capacity and anticipated future loss of income, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

260.    As a direct and proximate result of MGM's wrongful conduct, and the resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet ascertained, and when said amount is ascertained, Stephanie Fraser will seek leave of Court to amend this Complaint to allege said amount.   Lotus Herrera as Special Administrator of the Estate of Brian Fraser is also entitled to general damages and exemplary or punitive damages that decedent Brian Fraser would have recovered had he survived.

261.    Due to MGM's wrongful conduct, acts and omissions, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

262.    Due to MGM's wrongful conduct, acts and omissions, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

263.    Due to MGM's wrongful conduct, acts and omissions, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

264.    Due to MGM's wrongful conduct, acts and omissions, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

265.    Due to MGM's wrongful conduct, acts and omissions, Nicholas and Anthony Robone have been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

### NINTH CLAIM FOR RELIEF

**Negligent Hiring, Retention, and Supervision**

- 52 -

**FIRST AMENDED COMPLAINT**

266.     Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

267.     MGM owed a duty of care to hotel guests and concert-goers like Plaintiffs.

268.     MGM was negligent in the selection, hiring, training, supervision and/or retention of its employees, agents, servants, partners, associates, and/or associations, at all times relevant herein.

269.     MGM by and through its employees, agents, servants, partners, associates, and/or associations, breached its duty of care by failing to put into place safety protocols when it knew or should have known that its employees and/or agents and/or servants might cause a high risk to innocent parties such as Plaintiffs.

270.     MGM is vicariously liable for damages resulting from its employees', agents', servants', partners', associates' and/or associations' negligent actions against Plaintiffs during the scope of employment.

271.     As a direct and proximate result of MGM's negligent hiring, retention, and supervision, Plaintiffs sustained general and special damages in excess of Fifteen Thousand Dollars ($15,000.00).

272.     MGM acted recklessly, maliciously, and/or oppressively with intent to allow injury to Plaintiffs. MGM's failures amount to a conscious disregard for the safety of Plaintiffs, and others so as to constitute malice and oppression.  For the reasons set forth above, Plaintiffs are entitled to exemplary damages in an amount to be determined at trial.

273.     As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of MGM, Plaintiffs have sustained and will continue to sustain the above-mentioned injuries and damages.

274.     As a direct and proximate result of MGM's negligent conduct, Plaintiffs, each of them, suffered severe injury to their body and mind, past and future medical expenses, past and future pain and suffering, past and future severe emotional distress, disfigurement, loss of enjoyment of life, loss of past and future earning capacity and anticipated future loss of income, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

**FIRST AMENDED COMPLAINT**

275.     As a direct and proximate result of MGM's wrongful conduct, and the resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet ascertained, and when said amount is ascertained, Stephanie Fraser will seek leave of Court to amend this Complaint to allege said amount.   Lotus Herrera as Special Administrator of the Estate of Brian Fraser is also entitled to general damages and exemplary or punitive damages that decedent Brian Fraser would have recovered had he survived.

276.     Due to MGM's negligent conduct, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

277.     Due to MGM's negligent conduct, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

278.     Due to MGM's negligent conduct, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

279.     Due to MGM's negligent conduct, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

280.     Due to MGM's negligent conduct, Nicholas and Anthony Robone have been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

## TENTH CLAIM FOR RELIEF

### Gross Negligence: Punitive Damages

281.     Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

282.     Plaintiffs allege that all acts, conduct and omissions on the part of MGM taken singularly or in combination, constitute gross negligence and were the proximate cause of Plaintiffs' injuries and damages.  MGM's acts and/or omissions, when viewed objectively from

- 54 -

MGM's standpoint at the time such acts and/or omissions occurred, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  MGM had actual, subjective awareness of the risk, but proceeded with conscious indifference to the rights, safety and welfare of Plaintiffs.

283.    MGM's conduct was reckless and/or done with an intentional state of mind.  MGM acted with deliberate indifference by ignoring countless signs of suspicion, as a result of focusing its security on preventing theft against MGM, that, if noticed, would have prevented, or significantly thwarted, the Shooter's efforts.  Such gross negligence was a proximate cause of the occurrence and Plaintiffs' injuries and damages.

284.    That MGM acted recklessly, maliciously, and/or oppressively with intent to allow injury to Plaintiffs.

285.    That MGM acted with conscious disregard for the safety of Plaintiffs, and others so as to constitute malice and oppression, and Plaintiffs are entitled to exemplary or punitive damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

286.    As a direct and proximate result of all the foregoing and as a result of the willful acts and/or willful omissions of MGM, Plaintiffs have sustained and will continue to sustain the above-mentioned injuries and damages.

287.    As a direct and proximate result of MGM's willful and wrongful conduct, Plaintiffs, each of them, suffered severe injury to their body and mind, past and future medical expenses, past and future pain and suffering, past and future severe emotional distress, disfigurement, loss of enjoyment of life, loss of past and future earning capacity and anticipated future loss of income, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

288.    As a direct and proximate result of MGM's willful and wrongful conduct, and the resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet ascertained, and when said amount is ascertained, Stephanie Fraser will seek leave of Court to amend this Complaint to allege said amount.  Lotus Herrera as Special Administrator of the Estate of Brian Fraser is also entitled to general damages and exemplary or punitive damages that decedent Brian Fraser would have recovered had he survived.

- 55 -

**FIRST AMENDED COMPLAINT**

289.    Due to MGM's willful and wrongful conduct as alleged herein, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

290.    Due to MGM's willful and wrongful conduct, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

291.    Due to MGM's willful and wrongful conduct as alleged herein, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

292.    Due to MGM's willful and wrongful conduct as alleged herein, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

293.    Due to MGM's willful and wrongful conduct, Nicholas and Anthony Robone have been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Rachel Sheppard, individually; Stephanie Fraser, individually, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, deceased; Stephanie Fraser, as the Guardian Ad Litem for Aubree Fraser, a minor; Stephanie Fraser, as the Guardian Ad Litem for Brayden Fraser; Jovanna Calzadillas, individually; Francisco Calzadillas, individually; Nicholas Robone, individually; and Anthony Robone, individually, pray for relief in the form of a Judgment in their favor, and against MGM for damages as follows:

1)    For compensatory damages to be shown at trial;

2)    For actual and/or special damages to be shown at trial;

3)    For general damages to be shown at trial;

4)    Loss of past and future earning capacity;

5)    Loss of enjoyment of life;

- 56 -

**FIRST AMENDED COMPLAINT**

6)   Pecuniary damages, including, but not limited to grief or sorrow, loss of probable support, companionship, society, comfort, pain and suffering and disfigurement of Brian Fraser;

7)   For punitive and exemplary damages against Defendants in an amount to be determined at trial;

8)   For costs of suit, reasonable attorney's fees, and interest;

9)   For pre-judgment and post-judgment interest;

///

///

///

///

///

///

///

///

- 57 -

**FIRST AMENDED COMPLAINT**

1    10)    For such other and further relief as the Court may deem just and equitable under the

2    circumstances.

3    Dated: June ___, 2018

4    BY: _____          _____

5    Robert T. Eglet                      Mark P. Robinson, Jr.

6    Nevada Bar No. 3402                   California Bar No. 54426
     Robert M. Adams                      (*Nevada pro hac pending*)

7    Nevada Bar No. 6551                   Daniel S. Robinson
     **EGLET PRINCE**                     California Bar No. 244245

8    400 S. Seventh St., Suite 400        (*Nevada pro hac pending*)
     Las Vegas, NV 89101                  **ROBINSON CALCAGNIE, INC.**

9    (702) 450-5400; Fax: (702) 450-5451  19 Corporate Plaza Drive

10   eservice@egletlaw.com                Newport Beach, CA 92660
     -*and*-                              (949) 720-1288; Fax (949) 720-1292

11   Patrick McGroder III                 mrobinson@robinsonfirm.com
     Arizona Bar No. 002598               Richard K. Hy

12    (*Nevada pro hac pending*)          Nevada Bar No. 12406
     **GALLAGHER & KENNEDY**              (*Nevada local counsel*)

13   2575 East Camelback Road             **EGLET PRINCE**

14   Phoenix, AZ 85016                    400 S. Seventh St., Suite 400
     (602) 530-8000; Fax (602) 530-8500   Las Vegas, NV 89101

15   pjm@gknet.com                        (702) 450-5400; Fax: (702) 450-5451
     *Attorneys for Plaintiffs Jovanna and Frank*   -*and*-

16   *Calzadillas*                        James Lee
                                          (*Nevada pro hac pending*)

17   _____              Texas Bar No. 2404131

18   Kevin R. Boyle                       **LEE MURPHY LAW FIRM**
     (*Nevada pro hac pending*)           440 Louisiana St. #300

19   California Bar No. 192718            Houston, Texas 77002
     Rahul Ravipudi                       (713) 275-6990; (713)-275-6991

20   Nevada Bar No. 14750                 jlee@leemurphylaw.com
     Gregorio V. Silva

21   Nevada Bar No. 13583                 *Attorneys for Plaintiffs Rachel Sheppard;*
     Ellin Mardirosian                    *Stephanie Fraser; Lotus Herrera as Special*

22   Nevada Bar No. 14399                 *Administrator of the Estate of Brian Fraser;*
                                          *Stephanie Fraser, as the Guardian Ad Litem for*

23   **PANISH SHEA & BOYLE LLP**          *Aubree Fraser and Brayden Fraser*
     8816 Spanish Ridge Avenue Las Vegas,

24   NV 89148

25   (702) 560-5520; Fax: (702) 975-2515
     boyle@psblaw.com

26   *Attorneys for Plaintiffs Nicholas and*
     *Anthony Robone*

27

28
                                    - 58 -

                    **FIRST AMENDED COMPLAINT**

1

## DEMAND FOR JURY TRIAL

2        Plaintiffs hereby demand trial by jury of all claims and causes of action in this lawsuit to

3    which they are so entitled.

4    Dated: June _____ 4th_____, 2018

5    BY:

6    _____

7    Robert T. Eglet
     Nevada Bar No. 3402

8    Robert M. Adams
     Nevada Bar No. 6551

9    **EGLET PRINCE**
     400 S. Seventh St., Suite 400

10   Las Vegas, NV 89101
     (702) 450-5400; Fax: (702) 450-5451

11   eservice@egletlaw.com
     -and-

12   Patrick McGroder III
     Arizona Bar No. 002598

13   (*Nevada pro hac pending*)
     **GALLAGHER & KENNEDY**

14   2575 East Camelback Road
     Phoenix, AZ 85016

15   (602) 530-8000; Fax (602) 530-8500

16   pjm@gknet.com
     *Attorneys for Plaintiffs Jovanna and Frank*

17   *Calzadillas*

18   _____

19   Kevin R. Boyle
     (*Nevada pro hac pending*)

20   California Bar No. 192718
     Rahul Ravipudi

21   Nevada Bar No. 14750
     Gregorio V. Silva

22   Nevada Bar No. 13583
     Ellin Mardirosian

23   Nevada Bar No. 14399

24   **PANISH SHEA & BOYLE LLP**
     8816 Spanish Ridge Avenue Las Vegas,

25   NV 89148
     (702) 560-5520; Fax: (702) 975-2515

26   boyle@psblaw.com

27   *Attorneys for Plaintiffs Nicholas and*
     *Anthony Robone*

28

_____

Mark P. Robinson, Jr.
California Bar No. 54426
(*Nevada pro hac pending*)
Daniel S. Robinson
California Bar No. 244245
(*Nevada pro hac pending*)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax (949) 720-1292
mrobinson@robinsonfirm.com
Richard K. Hy
Nevada Bar No. 12406
(*Nevada local counsel*)
**EGLET PRINCE**
400 S. Seventh St., Suite 400
Las Vegas, NV 89101
(702) 450-5400; Fax: (702) 450-5451
-and-
James Lee
(*Nevada pro hac pending*)
Texas Bar No. 2404131
**LEE MURPHY LAW FIRM**
440 Louisiana St. #300
Houston, Texas 77002
(713) 275-6990; (713) 275-6991
jlee@leemurphylaw.com

*Attorneys for Plaintiffs Rachel Sheppard;*
*Stephanie Fraser; Lotus Herrera as Special*
*Administrator of the Estate of Brian Fraser;*
*Stephanie Fraser, as the Guardian Ad Litem for*
*Aubree Fraser and Brayden Fraser*

**FIRST AMENDED COMPLAINT**